**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WINTERS PERFORMANCE PRODUCTS, INC.,** | : | **CIVIL ACTION NO. 1:06-CV-2033** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **GRUPOS DIFERENCIALES S.A., et al.,** | : | |
| | : | |
| **Defendants** | : | |

**MEMORANDUM**

Presently before the court is the motion of defendants Grupos Diferenciales

S.A. ("Grupos") and Resource International, Inc. ("RI") to dismiss the products

liability claim asserted by plaintiff Winters Performance Products, Inc. ("Winters").

For the reasons that follow, the motion will be granted.

**I.   Statement of Facts**[1]

Winters manufactures and supplies "high performance components used

throughout . . . the domestic automobile racing industry," including "rear-end

assemblies." (Doc. 1 ¶¶ 7-8.) Winters' rear-end assemblies are "comprised of

various parts, including a ring and pinion set," which is a "critical piece of

equipment in the automotive powertrain." (Id. ¶¶ 9, 12.) According to Winters, a

ring and pinion set "rotates at high speed," and "failures tend to be spectacular,

---

[1] In accordance with the standard of review for a motion to dismiss, the court will present the facts as alleged in the complaint. See infra Part II. The statements contained herein reflect neither the findings of the trier of fact nor the opinion of the court as to the reasonableness of the parties' allegations.

spewing steel shrapnel," which frequently causes "significant damage within the larger rear-end assembly." (Id. ¶¶ 13-14.)

Beginning in 2002, Winters began purchasing ring and pinion sets that were manufactured by Grupos and that "consistently yielded satisfactory results." (Id. ¶ 18.) Winters alleges that the Grupos-manufactured ring and pinion sets were "imported by, delivered by, and invoiced through defendant RI." (Id. ¶ 17.) In May 2004, Winters allegedly placed a purchase order with Grupos for "one-thousand 51412 ring and pinion sets."[2] (Id. ¶ 19.) According to Winters, Grupos was "late in delivering the 51412 ring and pinion sets," which forced Winters "to deplete its then-existing inventory of 51412 ring and pinion sets." (Id. ¶ 22.) Consequently, in March 2005, Winters placed another purchase order with Grupos for an additional five-thousand 51412 ring and pinion sets, allegedly "to guarantee it would have required future inventory on hand." (Id. ¶ 23.) According to Winters, all parties understood that the "51412 ring and pinion sets were to be used in rear-end assemblies manufactured for racing applications" and that the "failure of a ring and pinion set . . . could be catastrophic not only in terms of damage to property, but also in terms of the risk to human life, both on the racetrack and among spectators." (Id. ¶ 20.)

Winters allegedly began selling custom rear-end assemblies containing the

---

[2] "[T]he number '51412' refers to the size and ratio of the gear and distinguishes the ring and pinion sets at issue from all other Grupos-manufactured ring and pinion sets Winters has purchased and sold." (Doc. 1 ¶ 19.)

"Grupos-manufactured 51412 ring and pinion sets" in "late 2005 for use in the 2006 racing season." (Id. ¶ 24.) According to Winters, ring and pinion sets that comply with their specifications "have typically endured for fifty or more separate races," often without any evidence of pitting. (Id. ¶¶ 15, 26.) However, Winters alleges that the Grupos 51412 ring and pinion sets experienced "catastrophic failures (*i.e.* broken and shorn teeth)" after just "*one* race or less, *i.e.*, after a paltry 2% of expected life." (Id. ¶¶ 25-26 (emphasis in original)). Winters further alleges that "the gears have also suffered substantial and premature pitting . . . after as little as *five miles* of use." (Id. ¶ 26 (emphasis in original)). Winters determined that "all of the Grupos-manufactured 51412 ring and pinion sets . . . displayed identical problems." (Id. ¶ 27.)

According to Winters, the 51412 ring and pinion sets "were delivered to Winters in a defective condition." (Id. ¶ 60.) Winters alleges that "Grupos' own internal design analysis testing of the 51412 ring and pinion sets at issue indicate that the sets were sub-standard inasmuch as the sets scored a 'Safety Factor' of less than 1 when Grupos subjected the sets to a Gleason Stress Test." (Id. ¶ 37.)

Winters further alleges that the ring and pinion sets were not properly subjected to cryo-processing, "a standard post-process" that "improves the

hardness of steel."[3]  (Id. ¶ 34.)  According to Winters, "[o]nce steel has been properly cryo-processed . . . further cryo-processing will have . . . no effect on hardness." (Id.)  Although Grupos "indicated that the 51412 ring and pinion gears had been subjected to cryo-processing," Winters alleges that independent cryo-processing of the Grupos-manufactured 51412 ring and pinion sets "resulted in a marked increase in the hardness of the . . . sets," implying that "Grupos either did not subject the . . . sets to cryo-processing, or its processing was sub-standard."  (Id. ¶¶ 33, 35-36).

On October 17, 2006, Winters commenced the above-captioned action.  (See id.)  Winters claims that Grupos and RI are strictly liable for delivering the 51412 ring and pinion sets in an unsafe, defective condition.  (Id. at 14-16.)  Winters also claims that Grupos and RI breached their contract with Winters.  (Id. at 12-14.)  Grupos and RI now move to dismiss the products liability claim, contending that the claim is barred by the "economic loss" doctrine and the "gist of the action" doctrine.[4]  (Doc. 6.)  The motion to dismiss has been fully briefed and is ripe for disposition.

---

[3] It is unclear whether Winters is asserting that Grupos' failure to subject their ring and pinion sets to proper cryo-processing violates an industry safety standard or a standard imposed by the contract.  However, even if the failure to properly cryo-process the ring and pinion sets is strictly a contractual standard, Winters' products liability claim may still be premised on the allegation that the Grupos-manufactured sets breached an industry safety standard by scoring a "Safety Factor" of less than 1 when subjected to a Gleason Stress Test.  (Doc. 1 ¶ 37); see infra Part III. A.

[4] Grupos and RI originally asserted a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  (See Doc. 6.)  Grupos and RI have since withdrawn that motion.  (Doc. 10 at 1 n.1.)

## II.   <u>Standard of Review</u>

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of claims

that fail to assert a basis upon which relief can be granted.  FED. R. CIV. P. 12(b)(6).

In the context of a motion to dismiss under Rule 12(b)(6), the court must accept as

true all of the factual allegations in the complaint and all reasonable inferences that

can be drawn therefrom.  <u>Langford v. City of Atlantic City</u>, 235 F.3d 845, 847 (3d

Cir. 2000) (citing <u>Nami v. Fauver</u>, 82 F.3d 63, 65 (3d Cir. 1996)).  Although the court

is generally limited in its review to the face of the complaint, it "may also consider

matters of public record, orders, exhibits attached to the complaint and items

appearing in the record of the case."  <u>Oshiver v. Levin, Fishbein, Sedran & Berman</u>,

38 F.3d 1380, 1384 n.2 (3d Cir. 1994); <u>see also</u> <u>In re Burlington Coat Factory Sec.</u>

<u>Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997).

Federal notice pleading rules do not require plaintiffs to allege affirmatively

every aspect of their claims, but only to present sufficient facts to allow the

opposing party to conduct discovery and prepare a defense.  <u>See</u> FED. R. CIV. P. 8(a)

(stating that the complaint should include "a short and plain statement of the claim

showing that the pleader is entitled to relief"); <u>see also</u> <u>Conley v. Gibson</u>, 355 U.S.

41, 45-46 (1957).  Thus, courts should not dismiss a complaint for failure to state a

claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief."  <u>Id.</u>; <u>see</u> <u>Swierkiewicz v.</u>

<u>Sorema N.A.</u>, 534 U.S. 506, 514 (2002).  Under this liberal pleading policy, courts

should generally grant plaintiffs leave to amend their claims before dismissing a complaint that is merely deficient.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000).

## III.   Discussion[5]

Defendants contend that Winters' products liability claim is barred by the "economic loss" doctrine.  The economic loss doctrine initially "provided that no cause of action could be maintained in tort for . . . strict liability where the only injury was 'economic loss' - that is, loss that is neither physical injury nor damage to tangible property."  2-J Corp. v. Tice, 126 F.3d 539, 541 (3d Cir. 1997); see, e.g., Aikens v. Baltimore & Ohio R.R. Co., 501 A.2d 277, 279 (Pa. Super. Ct. 1985).  While the doctrine has been interpreted to preclude a commercial buyer from recovering in tort for damage that "the product" does to itself, the doctrine does not bar recovery for damage to "other property."[6] E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 867-70 (1986); 2-J Corp. 126 F.3d at 542.

---

[5] Jurisdiction over the instant action is based on diversity of citizenship, see 28 U.S.C. § 1332, and neither party disputes the applicability of Pennsylvania law to plaintiff's claims, see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79-80 (1938); see also B&P Holdings I, LLC. v. Grand Sasso, Inc., 114 F. App'x 461, 465 n.4 (3d Cir. 2004); Borse v. Pierce Goods Shop, Inc., 963 F.2d 611, 613 (3d Cir. 1992).

[6] The Pennsylvania Supreme Court has not expressly adopted this expansion of the economic loss doctrine.  REM Coal Co. v. Apex, Inc., 563 A.2d 128, 129 n.2 (Pa. Super. Ct. 1989).  However, the Pennsylvania Superior Court and the United States Court of Appeals for the Third Circuit have predicted that it would.  Lower Lake Dock Co. v. Messinger Bearing Corp., 577 A.2d 631, 634-35 (Pa. Super. Ct. 1990); REM Coal, 563 A.2d at 132-34; Aloe Coal Co. v. Clark Equip. Co., 816 F.2d 110, 117-19 (3d Cir. 1987).

Defendants assert that the rear-end assemblies manufactured by Winters constitute "the product" and not "other property" and that, accordingly, Winters cannot recover in tort for damage to these assemblies.[7]  There is a dearth of case law defining the parameters of "the product" and "other property" for purposes of the economic loss doctrine.  It is clear, however, that the line of demarcation between "the product" and "other property" is drawn at the time of sale to the initial user.  Saratoga Fishing Co., 520 U.S. at 879 ("When the manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the

---

[7] Defendants argue that damage to "other property" does not include damage that is a foreseeable result of "the product's" failure.  Defendants further argue that because damage to a car's rear-end assembly is a foreseeable result of a ring and pinion failure, the rear-end assembly should be considered part of "the product" for which recovery in tort is barred by the economic loss doctrine.  (Doc. 10 at 7-11.)  This argument is unavailing.  In 2-J Corp., the defendant, a warehouse manufacturer, argued that the economic loss doctrine should bar recovery for damage to property stored within a collapsed warehouse because such damage was a foreseeable consequence of the warehouse's failure.  126 F.3d at 540.  The Third Circuit disagreed, stating:

> We are aware that a number of courts . . . have ruled that the economic loss doctrine bars tort recovery where the "other property" damaged was always likely to have been injured upon the failure of "the product" itself.  However, it is also true that numerous courts have rejected this expansion of the economic loss doctrine.  We find the latter cases more persuasive, and, particularly after Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875, 879 (1997), we are confident that the Pennsylvania Supreme Court would not conclude that the economic loss doctrine precludes recovery for damage to the contents of a warehouse when the warehouse collapses.

2-J Corp., 126 F.3d at 544 n.4 (citations omitted).  Accordingly, the court finds that the economic loss doctrine does not bar recovery in tort for damage to property that results from a product's failure simply because such damage was reasonably foreseeable.

'product itself' under East River." ); 2-J Corp., 126 F.3d at 543 (noting that the

analysis in Saratoga Fishing "ultimately established the time of sale to the initial

user as the critical point for determining whether *added* features are part of 'the

product itself' or 'other property.'" (emphasis in original)).  Although components

added to the product after the product is sold to the initial user may be considered

"other property" under the economic loss doctrine, components added before the

product is sold to the initial user are considered to be part of "the product" itself.

Saratoga Fishing Co., 520 U.S. at 882-84; 2-J Corp., 126 F.2d at 543 (stating that "'the

product itself' includes all components added before the sale to the initial user"); E.

River S.S. Corp., 476 U.S. at 867 (concluding that turbines damaged by defective

turbine components could not be considered "other property" for purposes of the

economic loss doctrine and noting that "[s]ince all but the very simplest of

machines have component parts, [a contrary] holding would require a finding of

'property damage' in virtually every case where a product damages itself.  Such a

holding would eliminate the distinction between warranty and strict products

liability.").

       In the action *sub judice*, the court finds that the rear-end assemblies are "the

product" and not "other property" for purposes of the economic loss doctrine

because the ring and pinion sets were integrated into the rear-end assemblies

before Winters sold the items to the initial users.  Therefore, the rear-end

assemblies were "the product" placed into the stream of commerce, and any

damage to the rear-end assemblies caused by the ring and pinion sets' failure

8

represents damage that "the product" caused to itself.  2-J Corp., 126 F.2d at 543;

Saratoga Fishing Co., 520 U.S. at 879, 882-84.  Accordingly, the court finds that the

economic loss doctrine bars Winters' products liability claim, and will grant

defendants' motion to dismiss this claim.[8]

      An appropriate order will issue.


                                                        S/ Christopher C. Conner
                                                CHRISTOPHER C. CONNER
                                                United States District Judge


Dated:      August 21, 2007

---

[8] Given the court's finding with respect to the economic loss doctrine, the court need not address defendants' contention that the "gist of the action" doctrine also bars Winters' products liability claim.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WINTERS PERFORMANCE** | : | **CIVIL ACTION NO. 1:06-CV-2033** |
| **PRODUCTS, INC.,** | : | |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **GRUPOS DIFERENCIALES S.A.,** | : | |
| **et al.,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 21st day of August, 2007, upon consideration of the motion to

dismiss (Doc. 6), filed by defendants Grupos Diferenciales S.A. and Resource

International, Inc., and for the reasons set forth in the accompanying

memorandum, it is hereby ORDERED that:

1.    The motion to dismiss (Doc. 6) is GRANTED.

2.    Plaintiff's products liability claim against defendants is DISMISSED.

3.    Leave to amend is DENIED as futile.  See Grayson v. Mayview State
      Hosp., 293 F.3d 103, 108 (3d Cir. 2002).


       S/ Christopher C. Conner
      CHRISTOPHER C. CONNER
      United States District Judge